**Opinion issued September 3, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00564-CV

_____

**EUTIVA THOMAS, THE PROVIDENCE HOME HEALTH SERVICES, INC., AND THE PROVIDENCE HOSPICE, INC., Appellants**

**V.**

**A\*MED MANAGEMENT, INC., Appellee**

On Appeal from the 56th District Court
Galveston County, Texas
Trial Court Case No. 19-CV-1003

## MEMORANDUM OPINION

Appellants, Eutiva Thomas and the Providence Home Health Services, Inc.,

and the Providence Hospice, Inc. ("Providence"), appeal the trial court's order that

granted a temporary injunction in favor of appellee, A\*Med Management, Inc.

("A*Med").[1]  In three issues on appeal, appellants argue that the trial court abused its discretion in granting the temporary injunction because (1) the record contains no evidence of an imminent irreparable injury; (2) the injunction lacks specificity; and (3) a non-compete agreement is void or, in the alternative, its provisions are unenforceable.

We affirm.

## Background

A*Med offers home healthcare services, including home and community hospice care, to patients across Texas.  Thomas had been working for A*Med since 2010, first as a community relations coordinator and then as a business development manager, marketing A*Med's services in Galveston.  On March 19, 2019, Thomas signed a non-compete agreement that limited her ability to compete with A*Med or solicit A*Med's referral sources after her employment ended.  Shortly after Thomas signed the agreement, A*Med reduced her ability to market A*Med's services.  In May 2019, Thomas resigned from A*Med and started working for Providence, a competitor that offers similar healthcare services as A*Med.

---

[1]     This is an accelerated interlocutory appeal pursuant to Texas Civil Practice and Remedies Code section 51.014(a)(4).    TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4).

2

On June 3, 2019, A*Med filed an original petition and application for temporary restraining order and application for temporary injunction and permanent injunction against Thomas and Providence, alleging that Thomas breached the non-compete agreement and that Providence tortiously interfered with its contract. A*Med sought actual and exemplary damages, attorney's fees, and injunctive relief pursuant to section 15.51 of the Texas Business and Commerce Code[2] and the common law.

The trial court issued a temporary restraining order on June 3, 2019, enjoining (1) Thomas and Providence from interfering with A*Med customer and employee relationships; (2) Thomas from working for Providence in Galveston County; (3) Providence from interfering with Thomas's contractual obligations to A*Med; and (4) Providence from receiving or using any confidential information from Thomas.

On July 1, 2019, Providence filed an original answer and counterclaim for tortious interference with an existing contract. Thomas also answered, generally denying the claims and counterclaiming for tortious interference with an existing contract. Thomas claimed that on March 19, 2019, she was shown only the signature page of the non-compete agreement.

---

[2] *See* TEX. BUS. & COM. CODE § 15.51.

Thomas and Providence filed a motion to dissolve the TRO and a response to the application for temporary injunctive relief. Thomas and Providence argued, "A*Med has failed to show and cannot show that it will suffer imminent, irreparable harm. A*Med seeks to enforce an invalid contract, and has failed to present any evidence that any damage it would suffer as a result of Mrs. Thomas' employment by Providence could not be compensated in monetary terms."

At the temporary injunction hearing held on July 12, 2019, Joe Hinojosa, A*Med's administrator for A*Med Hospice, testified that he countersigned the confidentiality non-compete and non-solicitation agreement. Hinojosa agreed that in exchange for having employees sign the non-compete, A*Med provided confidential information, which included referral sources and how A*Med conducted its business. Hinojosa testified that A*Med paid for Thomas's referral sources by reimbursing her expenses and that Thomas was generating 5 to 10 referrals a week. After she resigned, Hinojosa stated that the number of referrals from Thomas's territory decreased to zero to three referrals a week. Hinojosa further testified that he had been in the health care business since 1992 and a drop in referrals after an employee leaves was attributed to the employee taking the referrals with them.

On cross-examination, Hinojosa agreed that Thomas was not happy that a variety of UTMB facilities were being assigned to someone else. From the time

4

that Thomas signed the non-compete on March 19 through the time that she formally resigned on May 2, Hinojosa testified that she attended "Monday morning meetings where they discussed referral sources, opportunities for growth for the company and so on." Hinojosa agreed that for the referrals that have dropped since Thomas left, he did not know where the patients went, did not know if they went to Providence, and did not know if Thomas diverted the referrals to somewhere else. He agreed that he assumed that when someone leaves, they take referrals with them, but he had no information of whether that had happened here. When asked if "any sort of loss that you have experienced in terms of volume, that would be attributable to Mrs. Thomas's leaving your company," Hinojosa answered, "Yes."

Teresa Clark, the community relations coordinator for A*Med, testified that after Thomas left, she learned from case managers that Thomas had been at UTMB Galveston. Clark recalled a Community Assistance Providers of Galveston County (CAPGAL)[3] event where she saw Providence marketing materials on the tables. Clark also identified a photo she took that depicted Providence marketing materials and Thomas's Providence business card on a UTMB case manager's desk after Thomas left A*Med. On cross-examination, Clark said she received the Galveston

---

[3] CAPGAL is a non-profit entity that seeks to provide assistance to less fortunate residents of Galveston County.

territory after Thomas resigned, and she agreed that she did not see Thomas actually place marketing materials on the tables at the CAPGAL May event.

Nicksandra Hall testified that she attended the CAPGAL event on May 22 and also saw Providence marketing materials. Hall testified that on May 31, she saw Thomas on the 11th floor of UTMB Galveston and the only reason to visit that floor was for marketing purposes. Hall identified a photo she took of Thomas in the UTMB Galveston parking garage on the same day that she saw her on the 11th floor. Hall testified that she was aware that Thomas had visited case managers, and she testified that Thomas's key referral services were not sending her any business.

Thomas testified that that she started working for A*Med in 2009. At the time she resigned, her main scope of responsibility included home health and hospice, which she marketed in Galveston County to case managers at UTMB Galveston and other healthcare offices. Thomas testified that she was asked to sign a non-compete agreement on March 18, 2019 and that she signed the back page of the non-compete. She agreed that she had signed an older agreement, but A*Med wanted her to sign a new agreement because it lost the older agreement. She later had a conversation with A*Med's administrator, Josh Bernhardt, who said he was giving the UTMB Galveston business to another marketer. She then spoke with A*Med's owner, Walt Crowder, who encouraged Thomas to resign

6

from home health. After resigning from home health, she continued to work for A*Med's hospice business. She then completely resigned from A*Med on May 2, and started working for Providence on May 13, as a marketer for their home health and hospice business in Harris County.

Thomas testified that the picture of her walking to her car was taken on May 22 or May 31 while she was delivering CAPGAL information to someone at UTMB. When asked about the photo that depicted Providence materials and Thomas's business card at a UTMB caseworker's desk, Thomas explained that she met, outside of Galveston, a friend who worked at UTMB, but who was not directly involved with referrals. Thomas testified that she gave her business card to her friend because "something happened with her phone." Thomas testified that she would not market in Galveston County, she will continue working with CAPGAL in Galveston, and she will continue to see her personal doctors in Galveston.

Joan Faas, the community liaison with Providence, testified that Thomas had not shared private confidential information with her from A*Med. She further testified that she had not seen an influx of referrals come to Providence from UTMB Galveston and that Thomas was not actively marketing anywhere in Galveston.

The trial court signed a temporary injunction order on July 12, 2019, finding that appellants breached the non-compete agreement by interfering with A*Med's customer relationships and that if appellants are not deterred from interfering, A*Med will be without any adequate remedy at law because of the damage to A*Med's goodwill and loss of business relationships. The trial court's order restrained the following:

1.    Thomas and Providence are enjoined from either directly or indirectly interfering with A*Med's customer and employee relationships by soliciting any of Thomas's previous referral sources in Galveston County, Texas to terminate their relationship with A*Med or encouraging them to do business with Providence with regard to home health and hospice services.

2.    Thomas is enjoined from directly or indirectly marketing, calling upon, contacting, encouraging, handling, soliciting, entering into any agreement with, or providing or perform[ing] any services for, any referral source (including but not limited to physicians, nurses and health care facilities), customer or patient of A*Med with whom Thomas had contact, for any business or commercial reason with regard to home health or hospice services in Galveston County, Texas.

3.    Thomas is enjoined from participating in the networking luncheons or other networking events hosted by or in conjunction with Community Assistance Providers of Galveston County ("CAPGAL").

4.    Providence is enjoined from interfering with Thomas's contractual obligation to A*Med by allowing Thomas, whether directly or indirectly, to call upon, contact, encourage, handle, solicit, enter into any agreement with, or provide or perform any services for, any referral source (including but not limited to physicians, nurses and health care facilities), customer or patient of A*Med with whom Thomas had contact, for any business or commercial reason while employed by A*Med involving home health and hospice services in Galveston County, Texas.

5.    Providence is enjoined from receiving or using any confidential information from Thomas, including referral source information, pricing and cost information, marketing materials, billing, and payment information, customer lists, prospective customer information, identities of suppliers, production information, and/or price sheets.

6.    Thomas is enjoined from working for Providence in Galveston County, Texas.

7.    Thomas is not enjoined from working for Providence and can solicit referrals for or market home health and hospice services in counties other than Galveston County, Texas.

8.    Providence is not enjoined from providing, marketing services for, or soliciting referrals for home health and hospice services in Galveston County, Texas provided Providence is not directly or indirectly marketing to or soliciting referrals from Thomas's previous referral sources.

On July 23, 2019, appellants filed a motion to clarify the temporary injunction order, seeking clarification on the permitted scope of Providence's marketing efforts in Galveston County while the litigation continued. Appellants further requested clarification because the order failed to define or identify "previous referral sources." Thomas also moved for rehearing of the temporary

9

injunction, informing the trial court that she resigned from Providence, arguing that the portion of the injunction which restricted her from participating with CAPGAL was "beyond the scope of A*Med's interest in this case and beyond the language of the non-compete and beyond the legal right of A*Med to purs[u]e" and requesting the trial court to remove paragraph three from the injunction.

Appellants filed their notice of appeal on July 31, 2019.

On August 7, 2019, the trial court held a hearing on appellants' request for clarification. After a short discussion, the trial court denied the motion to clarify. The hearing continued, and Thomas's attorney explained that Thomas had resigned from Providence and argued for the removal of the portion of the trial court's order that restricted her from working with CAPGAL. By order dated October 7, 2019, the trial court removed the restrictions on Thomas from participating with CAPGAL.

**Irreparable Injury**

In their first issue, appellants argue that A*Med did not present any evidence "that by July 12, 2019, Appellants posed to or threatened A*Med with imminent irreparable injury."

**A.    Standard of Review**

The decision to grant or deny a temporary injunction lies in the discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of

discretion. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam). Because this is an interlocutory appeal, this Court's review is strictly limited to determining whether there has been a clear abuse of discretion by the trial court in granting appellee's application for a temporary injunction, and we do not address the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex. 1978); *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979) (because "the effect of a premature review of the merits is to deny the opposing party the right to trial by a jury . . . it will not be assumed that the evidence taken at a preliminary hearing on temporary injunction will be the same as the evidence developed at a trial on the merits"). In making this determination, we may not substitute our judgment for that of the trial court unless its decision was so arbitrary that it exceeded the bounds of reasonableness. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Id.* at 211. We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence. *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*, 312 S.W.3d 843, 848 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Davis*, 571 S.W.2d at 862).

11

A temporary injunction is an extraordinary remedy granted to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204. It does not issue as a matter of right. *Id.* Rather, the applicant must plead and prove the following elements: (i) a cause of action against the defendant, (ii) a probable right to the relief sought, and (iii) a probable, imminent, and irreparable injury in the interim. *Id.* The irreparable injury requirement is sometimes described in terms of the injured party having an inadequate legal remedy. *See id.* at 211. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Id.* at 204. Damages are an inadequate remedy if they are difficult to calculate; "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228–29 (Tex. App.—Fort Worth 2009, pet. denied). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *See Butnaru*, 84 S.W.3d at 204.

## B.    Analysis

In support of their argument that A*Med presented no evidence of imminent irreparable injury, appellants emphasize Hinojosa's testimony in which he stated

that he had no knowledge of Thomas diverting patient referrals to the benefit of Providence. Appellants cite the following testimony:

> Q. And so by virtue of [Thomas] resigning on May 2nd or May 6th, you lost patients coming into the various companies?
>
> A. Yes.
>
> Q. And do you know where those patients have gone to?
>
> A. No.
>
> Q. Do you know if they went to Providence?
>
> A. No.
>
> Q. Do you know if [Thomas] diverted the referrals somewhere else?
>
> A. No.
>
> Q. So earlier you said that you assume that when somebody leaves they take the referrals with them?
>
> A. Correct.
>
> Q. But you have no information that happened?
>
> A. None, specifically, no.

While we agree that this portion of Hinojosa's testimony lacks evidence of imminent, irreparable injury, other portions of Hinojosa's testimony and other record evidence demonstrates that the trial court heard some evidence of imminent irreparable injury.

13

Specifically, Hinojosa testified that Thomas was generating five to ten referrals a week while working for A*Med. After she resigned, the number of referrals from her territory decreased to zero to three referrals a week. Hinojosa testified that he has been in the health care business since 1992 and a drop in referrals after an employee leaves is attributed to the employee taking the referrals with them.

Teresa Clark testified that after Thomas left A*Med, she learned from case managers that Thomas had been at UTMB Galveston. Clark discussed a CAPGAL event where Providence materials were on the tables, and she identified a photo she took depicting Thomas's Providence business card on a case manager's desk at UTMB Galveston on May 23.

Nicksandra Hall testified that she attended a CAPGAL event on May 22 and saw Providence marketing materials being displayed. She also saw Thomas on May 31 on the 11th floor of UTMB Galveston, and she testified that the only reason to be on the 11th floor would be to market. Hall testified that she was aware that Thomas had seen case managers at UTMB Galveston, and she testified that Thomas's key referral services were not sending her any business.

Drawing all legitimate inferences from the evidence in a manner most favorable to the trial court's order, we conclude that A*Med presented evidence of a probable, imminent, and irreparable injury. *See RenewData Corp. v. Strickler*,

14

No. 03-05-00273-CV, 2006 WL 504998, at \*16 (Tex. App.—Austin 2006, no pet.) (mem. op.) ("Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury.") (citing *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (injunctive relief is proper where party proves non-compensable harm or damages that are difficult to calculate); *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ) (employee's use of confidential information regarding former employer's customer's financial assets and preferences can constitute a non-monetary injury suitable for injunctive relief). Accordingly, we conclude that the trial court did not abuse its discretion in finding an imminent, irreparable injury to A\*Med.

We overrule appellants' first issue on appeal.

## Specificity of Temporary Injunction Order

In their second issue, appellants argue that the temporary injunction order does not meet the specificity requirement found in Rule 683 because the injunction order does not define "previous referral sources." The appellants maintain that to determine the names and identifies of Thomas's previous referral sources, Thomas and Providence would necessarily have to violate the injunction because Thomas would have to disclose her prior referral sources.

## A. Applicable Law

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained. . . ." TEX. R. CIV. P. 683. An injunction must be "in clear, specific and unambiguous terms" so that the party enjoined can understand the duties or obligations imposed by the injunction and so that the court can determine whether the injunction has been violated. *See Ex parte Blasingame*, 748 S.W.2d 444, 446 (Tex. 1988) (orig. proceeding). An injunction "must be as definite, clear, and precise as possible. . . ." *Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220–21 (Tex. App.—Dallas 2005, no pet.). Further, an injunction must be narrowly tailored to address the offending conduct—it must not be so broad that it would enjoin a defendant from acting within its lawful rights. *See Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 866 (Tex. App.—Houston [1st Dist.] 1989, no writ); *accord Webb v. Glenbrook Owners Assoc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.) (*citing Hitt v. Mabry*, 687 S.W.2d 791, 795 (Tex. App.—San Antonio 1985, no writ)).

## B. Analysis

Appellants specifically cite paragraphs one and eight from the temporary injunction order, which provides,

1.      Thomas and Providence are enjoined from either directly or indirectly interfering with A\*Med's customer and employee relationships by soliciting any of Thomas's *previous referral sources* in Galveston County, Texas to terminate their Relationship with A\*Med or encouraging them to do business with Providence with regard to home health and hospice services.

8.      Providence is not enjoined from providing, marketing services for, or soliciting referrals for home health and hospice services in Galveston County, Texas provided Providence is not directly or indirectly marketing to or soliciting referrals from Thomas's *previous referral sources*.

(emphasis added).

Courts have held that an injunction order will not be found to be overly broad if the order enjoins a former employee from soliciting its former employer's customers without specifically stating the customers' names. *See Safeguard Bus. Sys., Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ); *see also Bertotti v. C.E. Shepherd Co*., 752 S.W.2d 648, 656 (Tex. App.—Houston [14th Dist.] 1988, no writ).  "Where secret customer information was one of the main assets sought to be protected, the trial court would defeat that purpose by requiring the public disclosure of such information."  *Safeguard Bus. Sys*., 822 S.W.2d at 644.  It is not "unreasonable to assume that he who is sought to be enjoined is sufficiently familiar with the employer's business and its customers to avoid violating the injunction."  *Id*.

17

The cases cited above apply to Thomas because she worked for A*Med and knew her previous referral sources. They are distinguishable as applied to Providence because Providence would not know of Thomas's previous referral sources. Notwithstanding that these authorities are distinguishable as to Providence, Thomas testified at the hearing that her main scope of responsibility in marketing home health and hospice was "UTMB Galveston, Victory Lakes and the clinics in Victory Lakes." She further testified that she targeted "case management and physicians." In addition, paragraphs two and four of the temporary injunction order also specify that referral sources refer to "physicians, nurses and health care facilities." In light of this evidence and the authorities above, we conclude that the temporary injunction did not violate Rule 683 as applied to Thomas or Providence.

In the same issue, Providence further argues, "Unless it attains A*Med's confidential information from Mrs. Thomas, Providence is effectively prohibited from all marketing in Galveston County." Despite Providence's argument, the temporary injunction order does not prohibit Providence from marketing to their existing referral sources in Galveston County. Paragraph eight of the temporary injunction specifically states that Providence is not enjoined from marketing its services in Galveston as long as they are not soliciting referrals from Thomas's previous referral sources. At the motion for clarification hearing, A*Med's attorney stated, "If [Providence] [has] business that is not tied to Ms. Thomas, then

18

absolutely they're allowed to do business in Galveston County." Likewise, the trial court stated at the hearing, "I don't think the order precludes [Providence] from keeping the business that he has." Providence's attorney responded, "That's what we were hoping to hear, Judge." We thus conclude that the temporary injunction order does not prohibit Providence from marketing to its existing clients in Galveston.

Appellants further argues that the injunction unlawfully prohibits Thomas from "attending any CAPGAL event where networking may occur, including important fundraising functions and meetings related to networking for purposes of raising capital and support for CAPGAL."

If, after an appeal has been perfected, a trial court modifies the appealed-of order, the reviewing court "must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment." TEX. R. APP. P. 27.3; *see also Flamingo Permian Oil & Gas, L.L.C. v. Star Exploration, L.L.C.*, 569 S.W.3d 329, 332 (Tex. App.—El Paso 2019, no pet.); *Parker v. Schlumberger Tech. Corp.*, 475 S.W.3d 914, 926 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Tex. Health & Human Servs. Comm'n v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615, 625 (Tex. App.—Austin 2013, no pet.). Where the complained-of defects of an initial order are remedied in the issuance of a subsequent order, the

19

initial complaints become moot. *Flamingo*, 569 S.W.3d at 331 (dismissing as moot three issues rectified by issuance of subsequent order executed while appeal was pending); *see also Smith v. Smith*, 681 S.W.2d 793, 797 (Tex. App.—Houston [14th Dist.] 1984, no writ).

After appellants filed their opening brief, the trial court issued an October 7, 2019 order that removed any restrictions between Thomas and CAPGAL. In their reply brief, appellants have not disputed that the restriction on Thomas in relation to CAPGAL has been removed. Because the trial court has removed any restrictions between Thomas and CAPGAL, this portion of appellants' second issue is now moot. *See Flamingo Permian Oil & Gas*, 569 S.W.3d at 332.

We overrule appellants' second issue on appeal.

### Valid Contract

In their third issue, appellants argue that the temporary injunction order is void and unenforceable because Thomas did not enter into a valid contract with A*Med. In the alternative, appellants argue that even if Thomas entered into a valid contract with A*Med, the non-compete provisions are unenforceable.

The legal issues before a trial court at a temporary injunction hearing are whether the applicant showed a probability of success and irreparable injury; the underlying merits of the controversy are not presented. *Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.); *Tom James of Dallas,*

*Inc. v. Cobb*, 109 S.W.3d 877, 882 (Tex. App.—Dallas 2003, no pet.). At a temporary injunction hearing, the trial court does not address the ultimate issue of whether a covenant not to compete is enforceable under section 15.50. *Tom James*, 109 S.W.3d at 882–83. "It follows that the appeal of an order granting or denying a temporary injunction based on a covenant not to compete does not present for appellate review the ultimate question of whether the covenant is enforceable under section 15.50 of the business and commerce code." *Loye*, 156 S.W.3d at 619 (citing Tex. Bus. & Com. Code § 15.50). A determination of "[t]hat issue awaits a final judgment on the merits, such as a final judgment entered after a jury or bench trial or a hearing on a motion for summary judgment." *Tom James*, 109 S.W.3d at 885.

We will not consider whether the parties entered into a valid contract when they signed the non-compete agreement. That determination must await a final judgment on the merits. *See EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (An appeal of an order granting or denying temporary injunction based on noncompete covenant does not present for appellate review ultimate question of whether covenant is enforceable under Covenant Not to Compete Act); *Vaughn v. Intrepid Directional Drilling Specialists, Ltd.*, 288 S.W.3d 931, 938 (Tex. App.—Eastland 2009, no pet.) ("[B]y

21

granting a temporary injunction, a trial court does not declare that a covenant not to compete is valid.").

We overrule appellants' third issue on appeal.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Lloyd and Countiss.